IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**ALLEN BETH INCORPORATED**                                         **PLAINTIFF**

v.                          No. 3:22-cv-59-DPM

**WASTE CONNECTIONS US, INC.**
**and WASTE CONNECTIONS OF**
**ARKANSAS, INC.**                                                  **DEFENDANTS**

**ORDER**

The parties continue to wrestle about whether Allen Beth is the correct plaintiff. The record from the first round, as supplemented by the evidentiary materials added in the current round, makes a few things clear enough. Waste Connections's predecessor made a contract with "Sharp Office Supply" in Ash Flat. Shelly Johnson signed as an owner. The parties' contract, *Doc. 25–1*, is appended. The contracting parties did business with each other for more than fifteen years. Allen Beth did not always turn square corners when it came to corporate names, fictitious names, and successors. But Shelly Johnson and her husband, Jeff, have been involved in the business through all these years. Allen Beth's amended complaint provides some of the corporate history.

After that pleading was filed, though, there were two more corporate developments. Allen Beth appears to have become "Sharp Office Furniture and Logistics, Inc." *Doc. 48–2*. Shelly Johnson

is the corporate treasurer, and Jeff Johnson is the president, as he was of Allen Beth. *Doc. 48-2; Doc. 56-1*. In addition, "Sharp Office Supply, Inc." has been incorporated—by other individuals, but at the same address where this small business has long operated. *Doc. 48-1*. This is intriguing, for the new entity carries the name of the original plaintiff. *Doc. 1; Doc. 43 at 6–7*. The why behind these two recent twists remains unexplained.

Whatever the whole story may be, it does not make any legal difference at this point. On the current record as a whole, Allen Beth has standing, and is the real party in interest in substance, because it made the original contract through an unregistered d/b/a name. *Iowa Public Service Co. v. Medicine Bow Coal Co.*, 556 F.2d 400 (8th Cir. 1977); Fed. R. Civ. P. 17. Any mis-naming issue can be corrected in due course. Waste Connections's motion to dismiss based on the naming and entity issues is denied without prejudice to renewal, if need be, on a more complete record.

Waste Connections also asks to end the case now on the merits. This request cannot be resolved on the motion to dismiss. But, in the alternative Waste Connections seeks summary judgment and has stated material facts supported by affidavits. The fighting issue is a notice-and-cure provision in the parties' contract. "Customer shall provide [Waste Connections] with written notice of any problem which it believes constitutes a failure by [Waste Connections] to fully perform

–2–

its obligations under this Agreement. [Waste Connections] will be considered in breach of this Agreement if [Waste Connections] does not cure the problem in ten (10) business days after receiving such notice." Appendix at ¶ 9a.

Allen Beth did not provide pre-suit notice of any overcharges. This case was filed in state court on 26 January 2022. Waste Connections calculated the alleged overcharges paid by Allen Beth for the five-year period before the suit began, determined that amount (adjusted for inflation) to be $2,698.87, added interest at 6%, and got a total of $2,860.80. On 8 February 2022, Kendrick Ketchum (Waste Connections's district manager for Arkansas) met with Shelly Johnson at the business. Ketchum gave Johnson a check for $3,000.00 (which she accepted but has never cashed), explained what the check covered, and informed her that Waste Connections had reduced Allen Beth's service rate to an amount less than it was in January 2017 and that Waste Connections would not charge Allen Beth the fuel surcharge fee in the future. To Ketchum, Johnson seemed satisfied with Waste Connections's fix of the alleged overcharges.

These are the material facts as stated by Waste Connections. *Doc. 48–1.* Allen Beth has responded to them with various legal arguments rather than with proof showing some genuine dispute. LOCAL RULE 56.1; *Conesco Life Insurance Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010). In a footnote, Allen Beth does say it disagrees with

Waste Connections's characterization of the conversation between Kendrick Ketchum and Shelly Johnson, as well as whether that exchange and the tender of the $3,000.00 check was a legitimate attempt to cure the breach. *Doc. 56 at 11, n.6*. This factually unsupported aside does not create a genuine issue of material fact. *Conesco*, 620 F.3d at 909. Allen Beth also argues that it would be premature to address notice and cure given the lack of discovery on the parties' disputes and communications about the alleged overcharges. But no affidavit or declaration establishing a good reason to defer this issue pending some necessary discovery has been offered. Fed. R. Civ. P. 56(d). The Court takes judicial notice of the calendar: Waste Connections tendered the cure on the ninth business day after receiving notice of the alleged overcharges. Fed. R. Evid. 201. No genuine dispute exists on the material facts about notice and cure.

The parties chose Texas law. "This Agreement shall be governed in all respects by the laws of the State of Texas, without giving effect to the conflict of laws rules thereof." Appendix at ¶ 10. Their choice was reasonably related to their transaction because Waste Connections's principal place of business is Texas. And the parties' choice does not offend any public policy of Arkansas's. *Arkansas Appliance Distributing Co. v. Tandy Electronics, Inc.*, 292 Ark. 482, 485, 730 S.W.2d 899, 900 (1987).

Texas law therefore applies to the deep issue: Is the parties' contractual term about notice and cure a covenant or condition? If the former, then Waste Connections has a claim for damages in the circumstances presented; if the latter, then Allen Beth's lack of notice and Waste Connections's tendered cure eliminate Allen Beth's claim for breach of the contract. *Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d 945, 948–49 (Tex. 1990); *C & C Road Construction, Inc. v. Saab Site Contractors, L.P.*, 574 S.W.3d 576, 586–89 (Tex. App.—El Paso 2019, no pet.).

This term is a condition. Because they can have harsh consequences, "conditions are not favorites of the law." *Criswell*, 792 S.W.2d at 948. This provision might indeed work a forfeiture. Waste Connections could point to lack of pre-suit notice and refuse to fix any problem. It could, for example, defend against the overcharges alleged here by saying that Allen Beth had let them slide. Absent lack of notice being excused, Allen Beth's alleged overcharges might stand. RESTATEMENT (SECOND) OF CONTRACTS § 225. Or this provision might work for good. It offers a way for Waste Connections to fix some non-performance, thus preserving the parties' agreement for waste collection and related services. Having this option makes good sense in a business relationship for continuing services. The parties' agreement was for a three-year term, renewable for an unlimited number of three-year terms unless Allen Beth gave a timely notice of

termination.  Appendix at ¶ 1.  The parties' working relationship endured for more than fifteen years before Allen Beth sued, and apparently still exists.

The Court must gather the parties' intentions about the notice-and-cure term from both the plain meaning of that term and the whole of their agreement.  *C & C Road*, 574 S.W.3d at 588.  The parties' contract uses a freighted word—if—in the sentence that deals specifically with a breach by Waste Connections.  That company "will be considered in breach of this Agreement if [Waste Connections] does not cure the problem in ten (10) business days after receiving such notice."  As a customer, Allen Beth had various obligations, such as not putting hazardous material in Waste Connections's containers, taking care of those containers, and providing unobstructed access to them.  Appendix at ¶¶ 6, 7a & 7b.  Allen Beth's main obligation was to pay monthly invoices upon receipt.  In an echoing grace period, the parties agreed that Allen Beth would not be in breach of this obligation until "ten (10) days after receipt of an invoice from [Waste Connections]."  Appendix at ¶ 3.

The parties' use of the word "if" in connection with Waste Connections's fix, or not, of a problem after notice signals an intention to create a condition.  *C & C Road*, 574 S.W.3d at 588.  The contract provides Waste Connections the opportunity to cure.  A failure to do so promptly creates the breach.  *Cheung-Loon, LLC v. Cergon, Inc.*,

392 S.W.3d 738, 744–45 (Tex. App.—Dallas 2012, no pet.); RESTATEMENT (SECOND) OF CONTRACTS § 224.

Because Texas Law disfavors conditions, the Court must consider whether another reasonable interpretation of the notice-and-cure provision exists. If the opportunity to cure is merely a promise, then Waste Connections would have a claim for damages resulting from Allen Beth's breach of that promise. *C & C Road*, 574 S.W.3d at 588. What would Waste Connections's damages be from Allen Beth's silence? The lost opportunity to cure, keep collecting waste, and keep getting paid. The potential damages from a customer's breach of this term, read as a promise, seem co-extensive with those available for the customer's non-performance of the contract as a whole—Allen Beth's loss of business. Reading this term as a promise or covenant rather than a condition reads it out of the contract. The Court must instead give legal effect to all of the parties' chosen words. *James Construction Group, LLC v. Westlake Chemical Corp.*, 650 S.W.3d 392, 414 (Tex. 2022).

Notice-and-cure conditions are commonplace under Texas law. *C & C Road*, 574 S.W.3d at 588 (collecting cases). Waste Connections proposed one in clear terms. Allen Beth accepted it long ago. And this condition is not harsh in the particular circumstances presented. Waste Connections did not say "No notice, Allen Beth, therefore our duty to address any billing problem is excused." *Compare, Solar Applications Engineering, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010);

-7-

RESTATEMENT (SECOND) OF CONTRACTS § 225. Waste Connections addressed the dispute both retrospectively and prospectively. That the company's fix may have been partly or wholly motivated by an intention to pretermit a class action rather to right a wrong does not alter its legal effect. The billing dispute was cured in Allen Beth's favor.

Allen Beth contends that Waste Connections waived its notice-and-cure defense by not asserting it in its motions to dismiss the earlier iterations of Sharp's complaint. But this defense is not among those waived by not asserting them at the first opportunity. Fed. R. Civ. P 12(h)(1). Waste Connections could have pleaded this defense in its eventual answer, then sought summary judgment. Fed. R. Civ. P. 12(c) & (h)(2). No procedural defect exists in Waste Connections's request for judgment now based on Allen Beth's lack of pre-suit notice and Waste Connections's timely cure.

Likewise, the Court sees no waiver in the tangled motion practice about removal, standing, subject matter jurisdiction under CAFA, and the real party in interest. The applicable procedural rules allowed Waste Connections to make the tactical choices it did.

Last, Allen Beth has not shown that notice would have been futile. *Cheung-Loon*, 392 S.W.3d at 745. Allen Beth says Waste Connections knew about the overcharges based on similar litigation in South Carolina. The undisputed facts here, however, show that Waste Connections cured after Allen Beth sued and provided particulars

-8-

about overcharges this business had paid. The fix undercuts Allen Beth's first argument from futility. The elimination of potential class-wide liability does not show that notice would have been futile, either. Parties do not make contracts intending to protect other similarly situated parties. Allen Beth's second futility-based argument also fails.

Allen Beth contends that, even if its breach claim falters based on the lack of notice and the tendered cure, its unjust enrichment claim survives. Waste Connections's main responding arguments are that Allen Beth has no standing and isn't the real party in interest. The Court has rejected those arguments. Allen Beth is the one who has been paying Waste Connections's invoices all these years. And while the general rule is that no claim for unjust enrichment exists when the parties have a contract that covers the disputed issue, as Allen Beth points out, this rule has many exceptions. *E.g., U.S. v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606–09 (8th Cir. 1999) (Arkansas law). Plus, neither Allen Beth nor Waste Connections have explored the legal effect of the cure: the refund, the reduced service fee, and the "no more fuel surcharges" promise.

The Court would benefit from focused arguments about the unjust enrichment claim and the applicable Texas law. The RESTATEMENT (SECOND) OF RESTITUTION AND UNJUST ENRICHMENT might provide some insights, too. The evidentiary record is, for the

moment, closed. And the parties' additional arguments must start from the rulings in this Order. Simultaneous supplemental briefs (ten-page limit) on unjust enrichment due by 8 September 2023. No replies. The pending motions remain under advisement.

So Ordered.

*WPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

23 August 2023



IESI AR
IESI ASH FLATS
100 Landfill Road
Cherokee Village, AR 72529
Ph: 870-994-7000
Fax: 870-994-2199

# SERVICE AGREEMENT
NON-HAZARDOUS WASTE

No. 659947

CUSTOMER ACCOUNT #: 03800 3632

EFFECTIVE DATE: _____

**ACCOUNT NAME:** _____
**SERVICE ADDRESS:** SHARP OFFICE SUPPLY
P.O. BOX 250
ASH FLAT, AR 72513
**CITY, ZIP** _____
**COUNTY** _____
**PHONE #** _____ **FAX #** _____
**CONTACT** _____
**ALTERNATE CONTACT** _____ **PHONE** _____

**BILLING NAME:** _____
**BILLING ADDRESS:** _____
**CITY, ZIP** _____
**COUNTY** _____
**PHONE #** _____ **FAX #** _____
**CONTACT** _____
**ALTERNATE CONTACT** _____ **PHONE** _____

Reason Code:
☐ New - NFC / NNB / NNO
    (Please Circle)
☐ Service Increase - INC
☐ Service Decrease - DEC
☐ Price Increase - IPR
☐ Price Decrease - DPR
☐ Renewal - REN
☐ Donation - DON
☐ Temp. Roll-Off - TRO
☐ Temp. Commercial - TTC

## EQUIPMENT/SERVICE SPECIFICATIONS

| Site | System | Quantity | Size | Lids | Wheels | Lock | Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 3yd | | | | 1xwk | $ 106.29 | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | Total | $ | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | | $ | Month ☐ Lift ☐ | |
| | | | | | | | NET CHANGE | $ | Month ☐ Lift ☐ | |

### SCHEDULE OF CHARGES

Extra Pick-up Charges
☐ Yard  ☐ Ton  ☐ Lift         $ _____

Delivery Charge                 $ _____

Equipment Rental
☐ Day  ☐ Month                  $ _____

Haul Cost Per Load              $ _____

Disposal Cost
☐ Yard  ☐ Ton  ☐ Load           $ _____

Haul & Disposal Cost            $ _____
Comments:
Plus Fuel surcharge and Taxes

**Appendix**

THE UNDERSIGNED INDIVIDUAL SIGNING THIS AGREEMENT ON BEHALF OF CUSTOMER ACKNOWLEDGES THAT HE/SHE HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS OF THIS AGREEMENT, ON REVERSE SIDE, AND THAT HE/SHE HAS THE AUTHORITY TO SIGN ON BEHALF OF CUSTOMER.

P.O. # _____
Fed I.D.# _____
Disposal Site _____

Ticket Req.: Y / N
Taxable: Y / N

CUSTOMER
_Shelly Johnson_ (AUTHORIZED SIGNATURE)
Owner (TITLE)   4-28-06 (DATE)
NAME (PRINT OR TYPE): Shelly Johnson

CONTRACTOR
_[signature]_ (AUTHORIZED SIGNATURE)
NAME (PRINT OR TYPE): Rod Smith
4-19-06 (DATE)
SALES I.D.

IESI-350S

## TERMS AND CONDITIONS

1. **TERM.** The term of this Service Agreement (this "Agreement") shall be for an initial term of thirty-six (36) months from the Effective Date, and shall be automatically renewed for thirty-six (36) months (renewal term) thereafter unless either party shall give written notice of termination, by Certified Mail, to the other party at least sixty (60) days but not more than one hundred eighty (180) days prior to the termination of the initial term or any renewal term.

2. **SERVICES.** IESI shall provide Customer with waste collection, transportation and disposal services for Customer's waste, refuse and/or recyclable materials. Customer grants to IESI the exclusive right to provide such services to Customer. Customer represents and warrants that it has no existing agreements with other companies or entities for the provision of such services, and hereby agrees to hold IESI harmless from any claims, losses or damages resulting from any actions regarding any preexisting contracts.

3. **SERVICE FEES.** Customer shall pay IESI monthly service fees in accordance with the "Schedule of Charges" set forth in this Agreement and the invoices delivered to Customer, plus any and all federal, state and local taxes, fees or other charges imposed upon collection, transportation, disposal or recycling services. Customer shall pay IESI for additional services performed by IESI that are not specifically set forth in this Agreement, in accordance with the terms of this Agreement. Customer shall pay in full IESI's service fees upon receipt of invoice, but no later than ten (10) days after receipt of an invoice from IESI. In the event payment is not timely made, IESI may, at its sole discretion, assess a late charge not to exceed the maximum interest rate allowed by law on all amounts due and owing by Customer. In the event that Customer fails to timely pay service fees, IESI may terminate this Agreement or suspend services until Customer has paid in full.

4. **RATE ADJUSTMENTS.**
   a. **Change in Service.** The parties agree that the type or frequency of service may be changed during the term of this Agreement without affecting the validity of this Agreement and that such change shall become a part of this Agreement. In the event Customer requests any additional services or a change in the type or frequency of service, the service fees charged by IESI will be adjusted and Customer agrees to pay the adjusted service fees. Upon agreement of the adjusted service fees, such modification shall become a part of this Agreement.
   b. **Rate Increases.** Customer agrees that IESI may increase the rates hereunder proportionately to adjust for any increase to IESI in disposal and fuel cost or any increases in transportation costs due to changes in location of the disposal facility. Additionally, Customer agrees that IESI may also increase the rates from time to time to adjust for increases in the Consumer Price Index, increases that IESI may proportionately pass through to Customer as a result of increases in the average weight per container yard of the Customer's Waste Materials (IESI initial assumption is that Customer's Waste Material does not exceed 85lbs per cubic yard), increases in IESI's costs due to changes in local, state or federal rules, ordinances or regulations applicable to IESI's operations or the services provided hereunder, and increases in taxes, fees or other governmental charges assessed against or passed through to IESI (excluding income or real property taxes), and shall not be withheld by the Customer. IESI may only increase rates for reasons other than set forth above with the consent of the Customer. Such consent may be demonstrated verbally, in writing or by the actions and practices of the parties.

5. **RELOCATION OF BUSINESS.** In the event Customer relocates its business to another area serviced by IESI, Customer shall notify IESI and such relocation will not affect the validity of this Agreement, as long as IESI agrees to continue service to Customer.

6. **WASTE MATERIALS.** Customer represents and warrants that the materials placed in the Equipment shall be "Waste Material" as defined herein and shall contain no other substances or materials. The term Waste Material as used in these Terms and Conditions shall mean solid waste generated by Customer excluding radioactive, volatile, highly flammable, explosive, biomedical, infectious, toxic or hazardous material. The term "hazardous material" shall include but not be limited to, any amount of waste listed or characterized as hazardous by the United States Environmental Protection Agency or any state agency pursuant to the Resource Conservation and Recovery Act of 1976, as amended, or applicable state law. IESI shall acquire title to the Waste Material when it is loaded into IESI's trucks. Title to and liability for any waste excluded above shall remain with Customer and Customer expressly agrees to defend, indemnify and hold harmless IESI from and against any and all damages, penalties, fines and liabilities resulting from or arising out of such waste excluded above.

7. **EQUIPMENT.** Customer acknowledges and agrees that all Equipment furnished hereunder by IESI shall remain the property of IESI. The word "Equipment" as used herein shall mean all containers used for the storage of Waste Material including stationary compaction units, stationary baling units, Waste Material loading devices, tanks, tankers, and such other on-site devices as may be specified on the face of this Agreement. IESI reserves the right to substitute the Equipment for similar Equipment at any time during the term of this Agreement.
   a. **Customer Responsibility.** Customer acknowledges that it has care, custody and control of the Equipment while at the Customer's location and accepts responsibility for all loss or damage to the Equipment (except for normal wear and tear or for loss or damage resulting from IESI's handling of the Equipment) and for its contents. Customer agrees not to overload, by weight or volume, move or alter the Equipment, and shall use the Equipment only for its proper and intended purpose. Customer agrees to indemnify, defend and hold harmless IESI against all claims, damages, suits, penalties, fines and liabilities for injury or death to persons or loss or damage to property arising out of Customer's use, operation or possession of the Equipment.
   b. **Access.** Customer shall provide unobstructed and reasonable access to the Equipment on the scheduled collection day. If the Equipment is inaccessible so that the regularly scheduled pick up cannot be made, IESI will promptly notify the Customer and afford the Customer a reasonable opportunity to provide the required access; however, IESI reserves the right to charge an additional fee for any additional collection service required by Customer's failure to provide such access.

8. **DRIVEWAYS AND PAVEMENT DAMAGE.** Customer warrants that any right of way provided by Customer for IESI's Equipment location to the most convenient public way is sufficient to bear the weight of all of IESI's Equipment and vehicles reasonably required to perform the service herein contracted. IESI shall not be responsible for damage to any private pavement or accompanying sub-surface of any route reasonably necessary to perform the services herein contracted and Customer assumes all liabilities for damage to pavement or road surface.

9. **BREACH AND DAMAGES.**
   a. **Breach.** Customer will be considered in breach of this Agreement if it: (1) fails to pay service fees as set forth in this Agreement; (2) attempts to terminate this Agreement without prior written notice as set forth in this Agreement; and/or (3) fails to comply with any of its obligations set forth in this Agreement. Customer shall provide IESI with written notice of any problem which it believes constitutes a failure by IESI to fully perform its obligations under this Agreement. IESI will be considered in breach of this Agreement if IESI does not cure the problem in ten (10) business days after receiving such notice. Where IESI determines, in its reasonable judgment, that the problem does not constitute a failure by IESI to perform its obligations, or where such problem is beyond IESI's reasonable control, IESI shall not be obligated to cure such problem and this Agreement shall remain in full force and effect.
   b. **Liquidated Damages.** In the event Customer terminates this Agreement prior to its expiration other than as a result of a breach by IESI or IESI terminates this Agreement for Customer's breach, including nonpayment, Customer agrees to pay to IESI as liquidated damages a sum calculated as follows: (i) if the remaining term under this Agreement is six or more months, Customer shall pay its most recent monthly charges multiplied by six; or (ii) if the remaining term under this Agreement is less than six months, Customer shall pay its most recent monthly charge multiplied by the number of months remaining in the term. Customer acknowledges that in the event of an unauthorized termination of this Agreement, the anticipated loss to IESI in such event is estimated to be the amount set forth in the foregoing liquidated damages provision and such estimated value is reasonable and is not imposed as a penalty. In the event Customer fails to pay IESI all amounts which become due under this Agreement, or fails to perform its obligations hereunder, and IESI refers such matter to an attorney, Customer agrees to pay, in addition to the amount due, any and all costs incurred by IESI as a result of such action, including, to the extent permitted by law, reasonable attorneys' fees.
   c. **Waiver.** The failure of IESI to exercise any right to terminate this Agreement and/or collect damages against Customer for any breach of this Agreement will not constitute a waiver of any of IESI's rights under this Agreement.

10. **APPLICABLE LAW.** This Agreement shall be governed in all respects by the laws of the State of Texas, without giving effect to the conflict of laws rules thereof.

11. **ASSIGNMENT AND BENEFIT.** This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective subsidiaries, successors and assigns. IESI may assign its obligations and rights under this Agreement without the consent of Customer. Customer may not assign it obligations or rights under this Agreement without the prior written consent of IESI.

12. **ATTORNEYS FEES.** In the event of a breach of this Agreement by either party, the breaching party shall pay all reasonable attorney's fees, collection fees and costs of the other party incident to any action brought to enforce this Agreement

13. **EXCUSED PERFORMANCE.** Neither party hereto shall be liable for its failure to perform or delay in performance hereunder due to contingencies beyond its reasonable control including, but not limited to, strikes, riots, compliance with laws or governmental orders, inability to get to container, fires, and acts of God and such failure shall not constitute a default under this Agreement.